THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LEON EUBANKS, Defendant-Appellant.

First District (5th Division)    No. 1—95—0114

Opinion filed April 26, 1996.

950

Rita A. Fry, Public Defender, of Chicago (Julie Hull, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and James E. Beligratis, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

After a bench trial, defendant Leon Eubanks was found guilty of three counts of aggravated criminal sexual assault and sentenced to 25 years' imprisonment. We affirm defendant's conviction on one count of aggravated criminal sexual assault, vacate the other two convictions and affirm defendant's sentence.

Sandra Porter testified that she is currently incarcerated in the Cook County jail as a result of having been charged with first degree murder in the death of her daughter Victoria. Porter testified that she is also the mother of the victim in this case, L.E. Porter testified that on April 4, 1993, she lived at 1340 South Ashland with her aunt, Roberta Vortes, and Vortes' eight children. Also living in the house

were Porter's four children, including her then two-year-old daughter L.E., and defendant, her then and current boyfriend. Porter, her children and defendant shared one bedroom. Porter testified that she and her children went to bed at approximately 11 p.m. on the evening of April 4, 1993. Before doing so, Porter changed L.E.'s diaper and saw nothing unusual in her diaper. At about 2 a.m., L.E. woke up crying for her bottle. Defendant came into the bedroom at that time, but left immediately without engaging in any conversation. Porter testified that she got up, retrieved a bottle for L.E., and then went back to sleep. At this time, defendant was in the kitchen talking with Vortes. Porter denied having a conversation with defendant regarding sex at any time during that night.

Porter testified that she woke up at 7 or 8 a.m. on April 5th. Defendant was with her in bed, along with her children. Porter changed L.E.'s diaper and again saw nothing unusual. Porter then left the apartment. When she returned at approximately 2:30 p.m., Porter changed L.E.'s diaper again and noticed that there was blood in her diaper. Porter took L.E. to the hospital where she was examined. Porter was not informed by the hospital personnel of their findings.

Porter admitted that she gave the following sworn testimony to the grand jury on April 14, 1993, but denied at trial the truth of her grand jury testimony. Porter testified before the grand jury that at approximately 12 midnight on April 5, 1993, she was in the bedroom with defendant when defendant asked her to have sex with him. Porter declined and defendant told her that she was going to regret it. Porter then went to sleep and defendant remained in the bedroom and watched television. Sometime later, Porter woke up. It was dark outside but the television was still on, giving off a bright light. Porter noticed that defendant was lying on top of L.E., with his hips moving up and down. Defendant wore no pants and his underwear was pulled down to his knees. L.E. was screaming. Porter asked defendant why he was doing this and defendant got up and pulled on his pants and underwear. Porter saw blood soaking through defendant's underwear. Defendant then put a diaper on L.E. Defendant told Porter that if she said anything about what she saw, he would kill her. Defendant then turned over and went to sleep. Porter stayed up with L.E., who was crying. Porter left the apartment at noon, but did not change L.E.'s diaper because defendant had already done so. When Porter returned home, defendant told her to check on L.E. because she was bleeding.

Porter denied having a conversation with Vortes after the incident while in front of a credit union wherein the two discussed what had happened to L.E. Porter denied telling Vortes that after

she had declined to have sex with defendant, defendant told her to "watch what I do"; that she later awoke to see defendant on top of L.E.; that defendant was moving up and down with his underwear pulled down; and that L.E. was crying. Porter admitted that on April 8, in the presence of Vortes, she later told two police officers that defendant had asked her to have sex and that she had refused; that she had subsequently seen defendant get on top of L.E. and have sex with her; that she saw blood on defendant's underwear; that defendant had threatened to kill her if she told anyone about the incident; and that defendant had beaten her up in the past. Porter further admitted telling the same information to an assistant State's Attorney on April 12, a Department of Children and Family Services (DCFS) caseworker on June 16, and a doctor at Mt. Sinai Hospital on June 25, 1993. Porter admitted that she told the prosecutor that her grand jury testimony was true and that defendant had threatened to kill her if she testified against him.

Porter acknowledged making a cassette tape recording wherein she recanted her grand jury testimony. Porter insisted that she had told the truth in the recording, but admitted telling an assistant State's Attorney that she had not told the truth but had only made the tape so that she could see her mother and stepfather. Porter also testified that on December 5, 1994, she told Officer Bright that defendant did not rape her daughter and further testified that she had told the same to the prosecutor on three or four previous occasions.

Porter acknowledged that she was not promised anything in return for her grand jury testimony, but that she had falsely implicated defendant because she was angry with him over fights the two had in the past and because "other people" were telling her what to do. Porter testified her last fight with defendant occurred one year prior to April 3, 1993, when defendant had sex with Porter's sister. Porter also stated that she had been angry at defendant for once leaving her children in the care of Vortes' boyfriend Jeff. Porter stated that her anger toward defendant and her desire to "get back at him" motivated her statements to the police on April 8, to the assistant State's Attorney on April 12, to the DCFS caseworker on June 16, and to the doctor at Mt. Sinai Hospital on June 25, 1993. Porter stated that when she appeared before the grand jury, she was essentially told what to say by the prosecutor.

Porter stated that she had listened to Vortes tell her what to do when she accused defendant of sexually assaulting her daughter. Vortes testified that L.E. had in the past had a rash on her genitals and had made herself bleed by placing her hands inside her diaper and touching her "private parts." Porter did not take her to the

hospital on that previous occasion because she was afraid DCFS would take L.E. away because she had let the rash get out of hand.

Roberta Vortes testified that on April 4, 1993, she went to bed at approximately 10 p.m. Porter had gone to bed earlier at approximately 7 or 8 p.m., and Porter's children and defendant were inside Porter's room at that time. Vortes testified that the door to Porter's room was closed and she did not see Porter or defendant leave the room. Vortes denied having been in the kitchen with defendant in the late evening and early morning hours of April 4 and 5.

Vortes testified that she was awakened by a sound which she recognized as L.E.'s screaming. Vortes called out to Porter, asking what was wrong with the baby. Vortes could not remember Porter's response, but stated that Porter never came out of the bedroom. At 7 a.m. when Vortes awoke, the door to Porter's room was still closed and Porter, her children and defendant were still in the house when Vortes left two or three hours later.

Vortes returned to the apartment after 2 p.m. and Porter arrived home approximately 15 minutes later. Porter told Vortes that her baby was bleeding anally. Vortes told Porter to take L.E. to the hospital, but Porter was reluctant to do so, stating that defendant had warned her not to go to the hospital and tell "stories on [him]." Vortes told Porter that she had no choice but to go to the hospital. The women then took L.E. to the hospital. When the women returned home, defendant and Vortes' boyfriend Jeff had moved out of the apartment.

Vortes testified that on April 7, she and Porter had a conversation in front of a credit union located on 14th Place. Vortes expressed concern that Porter's earlier statements to the police regarding what had happened to L.E. were causing the police to discuss the possibility of removing Vortes' children from her home. Vortes told Porter to tell the truth, because she had no intention of having her children taken from her. Porter then told Vortes what had happened to L.E. Porter told Vortes that defendant asked to have sex with her and, when she declined, stated "watch what I do." Defendant then removed L.E.'s diaper, got on top of her and began to have sex with her. Porter told Vortes that she saw blood on defendant's underwear when he finished and that she later had sex with defendant. Porter explained that she had previously told L.E.'s treating physician a different story because she feared that defendant would kill her. Vortes testified that she subsequently repeated Porter's story to the police and an assistant State's Attorney. Vortes further testified that she had seen defendant hit Porter while the two were living in Vortes' home.

Youth Officer Rolando Garza testified that he was assigned to investigate what had happened to L.E. He and his partner visited the University of Illinois Hospital on Taylor Street and spoke to the treating physician. Officer Garza spoke with Porter, who told him that she did not know how L.E. sustained her injuries. On April 8, Officer Garza interviewed Porter again in his police car in the presence of Vortes. Porter gave Officer Garza a version of events different than that which she had given him a few days earlier. Officer Garza also interviewed Vortes at that time. Porter told Garza that her previous statements to him were motivated by defendant's threat to kill her.

After defendant was arrested, he told Officer Garza that he had no knowledge of how L.E. had sustained her injuries and that he could not have forgotten what had happened because he did not drink or take drugs. Later, in the presence of an assistant State's Attorney, defendant stated that he could not remember what had happened that evening because he had been drinking. Defendant then admitted having consensual sex with Porter on the night in question. Defendant told Officer Garza and the assistant State's Attorney that he was awakened by the crying of his daughter Victoria, and that he heard Vortes yell out for them to quiet her. Defendant stated that he noticed blood in L.E.'s diaper when he changed her the following morning. When asked how L.E. had been injured, defendant responded that he had on a previous occasion seen L.E. placing her entire hand in her vagina, and that Porter had falsely implicated him because she owed him money. Defendant admitted that he had beaten up Porter in the past. Officer Garza testified that defendant asked several times while being interviewed how many years' punishment he would receive were he to admit assaulting L.E.

Dr. Diana Lawcewick-Mayer, an expert in the field of pediatric medicine, testified that she examined L.E. at the University of Illinois Hospital on April 5, 1993. The doctor spoke with Porter, who told her that she had left the child in the care of her boyfriend and when she returned home, she discovered blood in L.E.'s diaper. Dr. Lawcewick-Mayer noticed a one-millimeter tear located in the back on L.E.'s hymen, with occasional blood coming from it. A second superficial tear of the hymen was also present and the hymen itself was very red. The hymen's border was irregular. Dr. Lawcewick-Mayer testified that the one-millimeter tear at the back of the hymen indicated that an attempted or actual penetration by some object, possibly a penis, had occurred. The doctor explained that this attempted penetration took considerable force and could not have been as a result of any manipulation by L.E. because a child could

not cause the type of tensions required to cause a laceration in that area. Even if L.E. had been able to cause the laceration herself, the doctor testified that such laceration would have occurred at the opposite end of the hymen. Dr. Lawcewick-Mayer testified that the second tear of the hymen indicated that a very large object had attempted to penetrate and, in doing so, stretched the skin to the point of laceration. The hymen's redness was similarly indicative of a large, penetrating object. The doctor estimated that the injuries could have been sustained from 18 to 24 hours prior to the physical examination, which occurred at 6 p.m. on April 5. The hymen's irregular border appeared to be an old lesion. Dr. Lawcewick-Mayer testified that, in her opinion, L.E. had been sexually abused.

The parties stipulated that if Assistant State's Attorney Tim Moran were to testify, he would testify that he interviewed defendant upon his arrest in the presence of Officers Garza and Gibbons. After being advised of his constitutional rights, defendant told Moran that he had no memory of what occurred in the evening and morning hours of April 4 and 5, 1993, except for the memory of having sex with Porter. Defendant told Moran that when he changed L.E.'s diaper at 10 a.m. on the 5th, he noticed blood. Defendant told Moran that he had hit Porter in the past.

Defendant testified that in the early morning hours of April 5, 1993, he walked from the kitchen, where he had been visiting with Vortes, into his and Porter's bedroom. Defendant asked Porter to have sex with him, the two had sex, and then they went to sleep. Defendant was awakened at approximately 3 a.m. by the sound of his daughter Victoria screaming. Defendant saw Porter arise and retrieve a bottle, which she then fed to Victoria. Defendant arose at 9:10 a.m. and noticed that Porter and her children were gone.

Defendant stated that he told Moran that he had asked his three-year-old daughter Danielle to change L.E's diaper, because L.E. was wet. Defendant stated that he did not change diapers. Defendant denied telling Moran that he changed L.E.'s diaper on the morning of April 5, but confirmed that the rest of Moran's stipulated testimony was true. Defendant testified that when Danielle changed L.E.'s diaper, he noticed that there was blood in it. He told this to Porter when she arrived home that morning at 11 a.m. and told her to take L.E. to the doctor.

Defendant acknowledged that he initially told Officer Garza that he had no memory of what had happened and that he did not drink, but admitted that he had, in fact, been drinking on the night in question. Defendant insisted that L.E. fondled herself "all the time" when she was wet, although he only saw her do this on one occasion. De-

fendant stated that Porter was always mad at him for "something stupid," but that she was still always willing to have sex with him. Defendant admitted that he had hit Porter in the past, but denied ever threatening her.

The trial court found defendant guilty of three counts of aggravated criminal sexual assault and sentenced defendant to 25 years' imprisonment. Defendant appeals, contending that: (1) he was improperly restricted from inquiring into the specific ways in which Vortes influenced Porter to testify falsely; (2) the trial court erred in admitting into evidence out-of-court statements of Vortes and Porter; (3) defense counsel provided ineffective assistance of counsel by establishing venue; (4) the imposition of a 25-year sentence was an abuse of discretion; and (5) only one of defendant's convictions and sentences for aggravated criminal sexual assault may stand since all of the offenses derived from the same physical act.

■ Defendant's first contention is that he was deprived of his right to present a defense when the trial court prohibited counsel from inquiring about the specific ways in which Roberta Vortes influenced Sandra Porter to falsely accuse him. Defense counsel asked Porter who influenced her to tell the police that she had seen defendant assault her daughter. Porter responded that she was listening to Vortes. When defense counsel asked Porter what Vortes had told her, the court sustained the prosecutor's objection on hearsay grounds.

Defendant contends that Porter was influenced to falsely accuse defendant in order to obscure the fact that L.E. was left with Vortes' boyfriend Jeff prior to blood being found in L.E.'s diaper. Defendant claims that Vortes had an inordinate amount of power over Porter since Porter was a young, unemployed mother of four young children who was forced to live in cramped living conditions with Vortes and her eight children. According to defendant, it can be inferred that Porter conceded to Vortes' demands that she falsely accuse defendant or move out of the house. Defendant contends that such testimony was an exception to the hearsay rule, since it would explain Porter's motivation for testifying falsely before the grand jury, and it would explain her similar motives for giving false information to the police, the assistant State's Attorney, DCFS, and hospital personnel. Defendant claims that such testimony would also have shown Vortes' interest, motive or bias to testify falsely about her conversation with Porter in front of the credit union.

In support of his argument, defendant relies on *People v. Robinson*, 163 Ill. App. 3d 754, 516 N.E.2d 1292 (1987), wherein the court stated that where a defendant's theory is that a prosecution witness is unbelievable, defendant should be allowed to cross-examine that

witness on matters that would reasonably tend to show his bias, interest, or motive to testify falsely. However, the instant case is not a case where a State's witness has implicated a defendant at trial and the defendant is seeking on cross-examination to establish that the witness had a motive to give this false testimony at trial. Porter admitted at trial that she had lied when she implicated defendant prior to trial and explained that she did so because she was angry at defendant for sleeping with her sister. Defendant's theory that Porter was pressured by Vortes to testify falsely out of fear that she and her children would be forced to leave Vortes' home is unsupported by any evidence. To bring in such evidence through cross-examination of Porter raises hearsay concerns. Furthermore, regardless of the propriety of the trial court's ruling as to this issue, it would have had no impact on the outcome of this trial. Porter explained why she had implicated defendant to the authorities and the grand jury. Defendant had ample opportunity to cross-examine Porter and Vortes and raise implications as to their potential biases, interests and motives to testify falsely.

■ Defendant's next contention is that the trial court improperly allowed Vortes to give testimony containing hearsay and double hearsay. Porter testified at trial that she did not have a conversation with Vortes in front of the credit union during which she told Vortes that defendant had sexually assaulted L.E. Over defense counsel's objection, the prosecutor asked Porter:

"Isn't it true, Miss Porter, that you told Roberta Vortes that what really happened to your baby, [L.E.], was that *** [y]ou were in bed with Leon with the kids asleep. You didn't want to have sex. And that Leon said, 'Watch what I do.' You fell asleep. And then you woke up to see Leon pull his underwear down, get on top of your child, move up and down. And you heard your baby crying. Didn't you tell Roberta Vortes that before you told the police?"

Porter denied telling this to Vortes. Porter also denied telling Vortes that she was reluctant to take L.E. to the hospital because defendant had told her not to and threatened to kill her if she told anyone what he had done to L.E.

On direct examination, Vortes testified that she had a conversation with Porter in front of the credit union in which Porter told her:

"She was in the room with [defendant], in the room with her and the kids. She say that [defendant] asked her to have sex with him, and she told [defendant] that she didn't want to have sex with him right then and there. And then [defendant] say, 'well watch what I do,' like that. She said [defendant] went to the other end cause that's where [L.E.] was sleeping at the other end of her son;

went to the other end, took the baby pamper aloose [*sic*], and got on top of the baby. Was like having sex with the baby."

"She said that the reason that she said that, what she told the police at the hospital, and what she told the police at me, is that she said [defendant] was going to kill her or whatever."

The State contends that Vortes' testimony was necessary to impeach Porter and that the testimony was not hearsay since it was offered not for the truth of the matter asserted but for the fact that Porter had reported seeing and hearing defendant's acts or statements. However, had Vortes' testimony been elicited simply to impeach Porter, the State could have simply asked Vortes whether she had a conversation with Porter in front of the credit union during which Porter told her how L.E. was injured and that defendant had threatened to harm Porter if she took L.E. to the hospital. Nonetheless, we find that any error committed by the trial court in admitting Vortes' testimony was harmless in light of the overwhelming evidence of defendant's guilt and Porter's grand jury testimony, admitted as substantive evidence, which provided essentially the same evidence as Vortes' testimony.

■ Defendant next contends that the trial court improperly permitted Roberta Vortes and Rolando Garza to testify to out-of-court statements of Vortes and Porter. Roberta Vortes testified on direct examination that she heard L.E. scream and cry during the early evening hours of April 5, 1993. She also testified on direct that she told the investigating officers that she heard L.E. crying in the night. Rolando Garza testified on direct examination that during his investigation of the case, Vortes told him that she heard L.E. screaming.

Defendant contends that these statements were erroneously admitted because they were offered to bolster Vortes' testimony on direct examination. The State does not deny that Vortes' and Garza's testimony was improperly introduced as prior consistent statements, but argues instead that these errors were harmless since the record does not demonstrate that the trial court relied on the statements. In a bench trial, there is a presumption that the trial judge considered only competent evidence, and that presumption will be overturned only where the record affirmatively demonstrates the contrary. *People v. Puhl*, 211 Ill. App. 3d 457, 570 N.E.2d 447 (1991). Because the trial judge here overruled defendant's objections to the prior consistent statements, the trial judge obviously found this testimony to be competent. However, even if the trial court did consider the prior consistent statements, such error was harmless. Porter testified before the grand jury and at trial that L.E. was crying and screaming

in the middle of the night. Thus, Vortes' prior consistent statements were merely cumulative of other properly admitted testimony.

■ Defendant next maintains that he was denied effective assistance of counsel where the State did not establish the element of venue in its case in chief, but where defense counsel established it during the direct examination of defendant. To establish a claim of ineffective assistance of counsel, the defendant must prove that counsel's representation fell below an objective standard of reasonableness and that but for counsel's unprofessional error, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984). Our review of the record does not reveal that defense counsel provided defendant with ineffective assistance of counsel.

Venue is a material allegation that must be proved beyond a reasonable doubt along with the other elements of an offense. *People v. Luke*, 253 Ill. App. 3d 136, 625 N.E.2d 352 (1993). Circumstantial evidence may supply proof of venue if the only rational conclusion that can be drawn from the facts and circumstances is that the offense was committed in the county alleged in the charging instrument. *Luke*, 253 Ill. App. 3d at 142.

In *People v. Pride*, 16 Ill. 2d 82, 156 N.E.2d 551 (1959), the Illinois Supreme Court held the element of venue had been proven even though the only evidence of venue was that a trailer office belonging to the Kenny Construction Company and located at 8900 S. Anthony Avenue during the progress of construction work on the Calumet Skyway had been burglarized. The court explained:

> "Describing a location by street and number is so much a part of our every day life that it cannot be ignored. A witness's testimony should not be considered in a vacuum divorced from our general knowledge as to the manner in which things are said. And so, common experience dictates that a witness testifying in Chicago, when speaking of 8900 S. Anthony Avenue, is speaking of 8900 S. Anthony Avenue in Chicago, Cook County, Illinois, although there very well may be an 8900 S. Anthony Avenue in some city other than Chicago, in some county other than Cook and in some State other than Illinois.
>
> We would indeed be naive if we said under these circumstances that 8900 S. Anthony Avenue is an indefinite location. To suppose that the witness was speaking of 8900 S. Anthony Avenue in some other city, county or State would be unrealistic in the light of common knowledge as hereinbefore expressed." *Pride*, 16 Ill. 2d at 88.

See *Luke*, 253 Ill. App. 3d 136 (venue proved where witnesses testi-

fied as to street address where offense occurred and complaint alleged that that street was located in Cook County).

While defendant in the instant case accurately claims that no witness in the State's case in chief testified as to the city or county in which the offense occurred, the record reveals that the element of venue was nonetheless proven in the State's case by circumstantial evidence. Both Sandra Porter and Roberta Vortes testified that they resided at 1340 South Ashland on April 5, 1993, the date of the offense. Officer Garza testified that L.E. had been examined at the University of Illinois Hospital on Taylor Street. Assistant State's Attorney Moran's stipulated testimony revealed that defendant was questioned in connection with the offense at Area 2 Violent Crimes. The locations of 1340 South Ashland, University Hospital on Taylor Street and Area 2 Violent Crimes are commonly known to exist in the Chicago County of Cook. At the very least these locations are readily verifiable as existing in the City of Chicago, Cook County. We find that this circumstantial evidence was sufficient to establish that the offense occurred in Cook County and thus sufficiently established the element of venue during the State's case in chief. Therefore, we do not find that defense counsel rendered ineffective assistance of counsel when he elicited from defendant the testimony that 1340 South Ashland Avenue is located in Chicago. Venue would have been established and the result of the trial would have been the same even if defense counsel had not asked defendant where South Ashland was located.

■ Defendant next contends that the trial court abused its discretion in sentencing him to concurrent 25 years' imprisonment for the offenses of aggravated criminal sexual assault. Defendant contends that the trial court failed to consider defendant's potential for rehabilitation and failed to inform defendant of the reasons for his excessive sentence. Defendant claims that his sentence was excessive since he is visually impaired, has no prior criminal background, worked continuously for one year performing lawn care services and committed no crimes while on bond for the instant offense.

A trial court determination as to an appropriate sentence is entitled to great deference and cannot be altered by a reviewing court absent a finding that the trial court abused its discretion. *People v. Illgen*, 145 Ill. 2d 353, 583 N.E.2d 515 (1991); *People v. Steppan*, 105 Ill. 2d 310, 473 N.E.2d 1300 (1985). A reviewing court must not substitute its judgment for that of a sentencing court merely because it would have weighed the factors differently. *People v. Pittman*, 93 Ill. 2d 169, 442 N.E.2d 836 (1982). This is particularly true after a bench trial because the judge in presiding over the trial and listening

to and reviewing the evidence for and against a finding of defendant's guilt is in the best position to determine the appropriate sentence. *People v. Felella*, 131 Ill. 2d 525, 546 N.E.2d 492 (1989). The trial court in reaching a reasoned determination as to the proper sentence to impose must consider the particular circumstances of the case, the defendant's credibility, demeanor, general moral character, mentality, social environment, habits and age. *People v. Calahan*, 272 Ill. App. 3d 293, 649 N.E.2d 588 (1995).

Defendant relies primarily on *People v. Harris*, 187 Ill. App. 3d 832, 543 N.E.2d 859 (1989), in support of his argument that his sentence is excessive. In *Harris*, the court "cautiously" found the defendant's 25-year sentence for aggravated criminal sexual assault to be an abuse of discretion. In *Harris*, the reviewing court essentially reweighed the factors in aggravation and mitigation and determined that because defendant was a first time offender, had an alcohol problem, and had a steady work history, the 25-year sentence was excessive.

Prior to sentencing defendant to 25 years' imprisonment, the trial court in the instant case stated:

> "This court had had the opportunity to listen to the arguments of both able counsel, I've considered the statutory factors in or—that that are applicable here in aggravation and mitigation. I've considered this defendant's potential for rehabilitation, his lack of any significant prior criminality. I read the pre-sentence investigation over and over and I'm thoroughly conversant with its contents and I recall the facts of this case very very well. I have had an opportunity to weigh all of those factors very carefully. Very carefully considering the gravity of the offense. My findings are predicated upon the totality of all those factors."

We decline to reweigh the factors in aggravation and mitigation since that is not the role of a reviewing court. Furthermore, we believe that the facts of this case more strongly compel a 25-year sentence than did the facts in *Harris*. The defendant in *Harris* penetrated the seven-year-old victim's vagina with his finger. The evidence in the instant case indicates that defendant penetrated the two-year-old victim with his penis. Porter's grand jury testimony reveals that she saw defendant lying on top of L.E. with his hips moving up and down. Defendant was not wearing pants or underwear. L.E. was screaming and bleeding and when defendant put his underpants on, blood soaked through them. Porter, Vortes and defendant all testified that L.E. was bleeding the next day. After examining L.E., a doctor found it apparent that some actual or attempted penetration, by some large object, possibly a penis, had occurred. The

doctor testified that considerable force was used. There were two tears to L.E.'s hymen, and her hymen was very red. Furthermore, the fact that defendant had violent tendencies was demonstrated by trial testimony that defendant had beaten Porter in the past and had threatened to kill her if she told police what he had done to her two-year-old daughter.

In *Calahan*, the court refused to find that a 16-year sentence for aggravated criminal sexual assault was excessive, although defendant had no prior criminal history. The court found significant the fact that the defendant was acting as a father figure to the four-year-old victim when he inserted his finger into her vagina, causing significant scarring. *Calahan* 272 Ill. App. 3d at 297. Likewise, the defendant here held a position of trust and responsibility for L.E. Defendant lived in the same house as L.E., along with other children he had fathered with L.E.'s mother. Thus, although defendant was not L.E.'s father, he likely served as a father figure for her.

The statutory range for defendant's conviction of aggravated criminal sexual assault, a Class X felony, is from 6 to 30 years. 730 ILCS 5/5—8—1(a)(3) (West 1992). The trial court considered factors in aggravation and mitigation, and imposed a 25-year sentence, which was within the statutory range. Under the circumstances of this case, we cannot say that an abuse of discretion occurred.

■ Defendant's last contention is that because his three aggravated criminal sexual assault convictions were based on the same physical act, the convictions and sentences for all but one of these counts must be vacated. Defendant was convicted of one count of committing an act of sexual penetration upon a victim under the age of 13. Ill. Rev. Stat. 1991, ch. 38, par. 12—14(b)(1) (now 720 ILCS 5/12—14(b)(1) (West 1992)). The other two convictions were for committing an act of sexual penetration upon a victim who was unable to understand the nature of the act and, in the alternative, upon a victim who was unable to give knowing consent. Ill. Rev. Stat. 1991, ch. 38, par. 12—14(a)(2). The State agrees that the convictions were based on the same physical act and that pursuant to *People v. King*, 66 Ill. 2d 551, 363 N.E.2d 838 (1977), defendant may be convicted and sentenced on only one of these counts. The State has the right to elect which conviction should be retained. *People v. Holman*, 103 Ill. 2d 133, 469 N.E.2d 119 (1984). The State elects to retain defendant's conviction for aggravated criminal sexual assault based on the finding that defendant committed an act of sexual penetration upon a victim he knew was unable to understand the nature of the act. We therefore vacate defendant's other convictions.

Accordingly, for the reasons set forth above, we affirm defendant's

conviction on one count of aggravated criminal sexual assault, vacate the other two convictions and affirm defendant's 25-year sentence.

Affirmed in part and vacated in part.

COUSINS and HOURIHANE, JJ., concur.